IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MARIETTA MEMORIAL HOSPITAL, et al.,

                Plaintiffs,

v.                                  CIVIL ACTION NO.   2:16-cv-08603

WEST VIRGINIA HEALTH CARE AUTHORITY, et al.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Temporary Restraining Order, Preliminary and/or Permanent Injunction.[1]   (ECF No. 8.)   For the reasons provided below, the Court **GRANTS** Plaintiffs' motion for preliminary injunctive relief.

### I.   BACKGROUND

This case involves an action by out-of-state healthcare organizations Marietta Memorial Hospital and Marietta Area Health Care, Inc., and in-state corporation MHC Physicians, Inc., (collectively, "Marietta"), who are challenging a recently passed state statute that creates a new exemption to West Virginia's Certificate of Need ("CON") program.   *See* W. Va. Code § 16-2D-

---

[1]  Given that the parties agreed to a standstill order reflected in the Court's agreed order issued on September 23, 2016, (*see* ECF No. 14), and that the motion hearing held October 24, 2016, focused on Plaintiffs' desire for preliminary injunctive relief pending full adjudication of this matter, the current motion will be construed as one seeking a preliminary injunction.

11(c)(12).   Marietta seeks to prevent the West Virginia Health Care Authority ("HCA") from enforcing the allegedly unconstitutional statute.

West Virginia's CON program, codified at West Virginia Code § 16-2D-1, *et seq.*, requires that a hospital seeking to introduce or remove various health services obtain approval from HCA in the form of a CON.   *See* § 16-2C-8.   The types of changes in health services that require a CON include, among many others, constructing, developing, or acquiring a health care facility; substantially changing the bed capacity of a health care facility; and acquiring major medical equipment.   *See* § 16-2C-8(a)(1), (5), (8), (9).   To obtain a CON, a health care entity must first file an application with HCA.   *See id.* § 16-2D-13.   HCA then reviews the application, taking into consideration the criteria set forth in § 16-2D-12.   Subsection twelve requires HCA to find that the proposed change in health services is needed and consistent with the state health plan. *See* § 16-2D-12(a).   An "affected person," as defined in § 16-2D-2, may request a hearing on any application, and upon such a request, HCA must hold a hearing and consider testimony and evidence offered prior to approving a CON application.   *See* §§ 16-2D-7, 16-2D-13.   After satisfaction of the statutory procedures provided in § 16-2D-13, HCA renders a final decision accompanied by written findings.   *See* § 16-2D-15.   HCA may issue an approval, denial, or approval with conditions.   *See id.*   These laws implement the legislature's pronounced public policy regarding CONs set out in § 16-2D-1.

Chapter Sixteen of the West Virginia Code provides various exceptions to the CON process.   *See* §§ 16-2D-10, 16-2D-11.   Under § 16-2D-10, certain health services may be provided to the public without obtaining a CON or applying to HCA for approval.   On the other hand, § 16-2D-11 enumerates specific exemptions to the CON procedure that nonetheless require

2

approval from HCA.   Exemptions requiring approval from HCA include, among others, a health care facility acquiring medical equipment, adding health services, or obligating a capital expenditure, to be used solely for research and without affecting other services within the facility; the addition of forensic beds in a health care facility; and the replacement of major medical equipment with like equipment.   *See* § 16-2D-11(c)(3), (7), (9).   West Virginia's legislature enacted an exception by legislative rule in 2010 that exempted in-state hospitals from seeking a CON "for the construction, development, acquisition or other establishment by a hospital of an ambulatory health care facility."   *See* W. Va. Code R. § 65-27-3.   If an affected person opposed the exemption, then the hospital was required to file a CON application.   (*See* ECF No. 23 at 3, ¶ 9.)

However, in its 2016 session, the Legislature modified this exemption.   Thus, as of June 10, 2016, a full-fledged exemption to the CON process went into effect for "[t]he construction, development, acquisition or other establishment by a licensed West Virginia hospital of an ambulatory health care facility in the county in which it is located and in a contiguous county within or outside this state . . . ."   § 16-2D-11(c)(12).   As with other exemptions in subsection (c), and unlike the former legislative rule exemption related to ambulatory health care facilities, "[a]n affected party may not file an objection to the request for an exemption."   § 16-2D-11(b). The only review provided by this section is the ability of the exemption applicant to appeal an unfavorable decision "to the Office of Judges or refile the application with the authority."   *Id.* West Virginia entities Camden-Clark Memorial Hospital and Camden-Clark Physician Corporation (collectively, "Camden-Clark"), filed a request for an exemption under § 16-2D-11(c)(12), on August 15, 2016, "to open a new ambulatory health care facility by completing its

3

multi-million dollar purchase of a large primary care physician practice in West Virginia . . . ." (ECF No. 23 at 6, ¶ 23.)   That exemption request prompted Marietta to file the current action.

Marietta filed its Complaint in this Court on September 6, 2016, challenging the exemption set out in § 16-2D-11(c)(12).   (ECF No. 1.)   Subsequently, it filed the current motion on September 15, 2016.   (ECF No. 8.)   Defendants responded to the motion on October 19, 2016, (ECF No. 20), and a motion hearing was held by the Court on October 24, 2016.   (ECF No. 24.) As such, Marietta's motion has been briefed and argued by the parties and is ready for disposition.

## II.   LEGAL STANDARD

"Rule 65 of the Federal Rules of Civil Procedure provides for the issuance of preliminary injunctions as a means of preventing harm to one or more of the parties before the court can fully adjudicate the claims in dispute."   *Fred Hutchinson Cancer Research Ctr. v. BioPet Vet Lab, Inc.*, 768 F. Supp. 2d 872, 874 (E.D. Va. 2011).   A preliminary injunction is an extraordinary remedy never awarded as of right.   *See Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009) (hereinafter "*Real Truth I*"), *vacated on other grounds*, 559 U.S. 1089 (2010), *reissued as to Parts I & II*, *Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010).   In each case, the Court must balance the competing claims of injury and consider the effect of granting or withholding the requested relief.   "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."   *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

"A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).   "All four elements must be established by a 'clear showing' before the injunction will issue."   *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 868 (S.D. W.Va. 2014) (quoting *Real Truth I*, 575 F.3d at 346).   The plaintiff bears the burden of showing a "sufficient factual basis" for granting the injunction "beyond the unverified allegations in the pleadings."   *Id.* at 868–69 (citations omitted).

The plaintiff must demonstrate a *likelihood* of irreparable harm without a preliminary injunction; a mere *possibility* of harm will not suffice.   *Id.* at 21.   Such likelihood of irreparable harm justifies a preliminary injunction to protect the status quo and "preserve the court's ability to render a meaningful judgment on the merits."   *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). *See also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").   A plaintiff does not have to prove his or her case in full to succeed on a motion for preliminary injunction, and the findings of fact and conclusions of law made at this stage are not binding at a trial on the merits.   *See id.* (citations omitted).

Regarding likelihood of success, prior law in the Fourth Circuit was that there is a "'flexible interplay' among all the factors considered . . . for all four [factors] are intertwined and each affects in degree all the others."   *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977) (citations omitted).   Accordingly, plaintiffs were not strictly required to demonstrate likelihood of success on the merits.   Rather, "it [was] enough that grave or serious questions on the merits [were] presented."   *Id.*   But in the wake of the Supreme Court decision

5

in *Winter*, the *Blackwelder* balancing approach "may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit." *Real Truth I*, 575 F.3d at 347. Instead, the Fourth Circuit has held that a party seeking a preliminary injunction must demonstrate by "a clear showing that it is likely to succeed at trial on the merits." *Id.* at 351. The Fourth Circuit has not expressly required a movant to prove that success on the merits is "more likely than not" in order to meet the requirement of a clear showing, but the new requirement "is far stricter than the *Blackwelder* requirement that the plaintiff demonstrate only a grave or serious question for litigation." *Id.* at 345–46.

## III. DISCUSSION

Marietta argues that each of the *Winter* factors is satisfied in this case and requests that the Court enter preliminary injunctive relief. (*See* ECF No. 9 at 5–14.) Defendants contest each of the *Winter* factors. (*See* ECF No. 20 at 11–32.) For the reasons that follow, the Court finds that each of the *Winter* factors weighs in favor of granting a preliminary injunction in this matter.[2]

---

[2] The Court notes that, as discussed in the motion hearing on October 24, 2016, this case potentially raises a ripeness issue insofar as Marietta has not had the opportunity to participate in the exemption process or appeal any decision by HCA regarding Camden-Clark's exemption application.

Of course, "[a] plaintiff . . . lacks standing if his claim is not ripe." *Pashby v. Delia*, 709 F.3d 307, 317 (4th Cir. 2013). "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)). "In determining ripeness, we balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Id.* (citation omitted). "The fitness prong prevents a court from considering a controversy until it is presented in 'clean and concrete form.'" *King v. Sebelius*, 997 F. Supp. 2d 415, 424–25 (E.D. Va. 2014) (quoting *Doe*, 713 F.3d at 758). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiff." *Id.* (citing *Doe*, 713 F.3d at 758). "In considering the hardship to be balanced against the fitness of the issues for review, [courts] may consider the cost to the plaintiff of delaying review." *Doe*, 713 F.3d at 759 (citation omitted).

Here, Marietta is challenging the exemption found in West Virginia Code § 16-2D-11(c)(12), and Camden-Clark's pending exemption application under that section. (*See* ECF No. 1 at 2, ¶ 4.) Defendants argued at the motion hearing that this issue is not ripe for a court's determination because Marietta has not participated in the exemption process—it has not written a letter to HCA asking for affected party status, and it has the ability to appeal HCA's decision on Camden-Clark's exemption application to the Office of Judges and, ultimately, to the Circuit Court of Kanawha County and the West Virginia Supreme Court of Appeals. *See* § 16-2D-16. Defendants claimed that Marietta could apply to HCA for a stay on issuing the exemption while Marietta appeals a decision granting it but could not confirm that the exemption's issuance would be stayed until the whole appeals process is completed.

A.   *Likelihood of Success on Merits*

Under the first *Winter* factor, "plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits."   *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citing *Winter*, 555 U.S. at 20).   "Although this inquiry requires plaintiffs seeking injunctions to make a clear showing that they are likely to succeed at trial, plaintiffs need not show a certainty of success."   *Id.* (citations omitted).   Nonetheless, "[m]erely showing that 'grave or serious questions are presented for litigation' will not suffice."   *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 871 (S.D. W.Va. 2014) (quoting *Real Truth I*, 575 F.3d at 346–47).

Marietta relies on the following four bases in the Complaint when arguing that West Virginia Code § 16-2D-11(c)(12) is unconstitutional: the dormant commerce clause, the Fourteenth Amendment due process clause, Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1988, and the Fourteenth Amendment equal protection clause.   For the purposes of the instant opinion addressing prospective injunctive relief, the Court shall focus on Marietta's claim that HCA is

---

Marietta responded at the hearing by reiterating that the only reason Camden-Clark's exemption has not been issued is because the parties in this case reached a standstill agreement and that if that agreement were lifted, then the exemption would become effective immediately with or without action by HCA after forty-five days from the application's filing.   *See* § 16-2D-11(b).   As far as appealing HCA's decision, Marietta claimed that the applicable statute only provides the right to appeal an unfavorable decision to an exemption applicant and not to another affected party.   *See id.*   Defendants do not agree, citing § 16-2D-16, despite the facts that the section heading reads "[a]ppeal of certificate of need decision" and that the process at issue provides an exemption from acquiring such a CON decision.

The Court determines for the purposes of this motion that Marietta's claim is ripe.   The harm claimed by Marietta will be suffered as soon as HCA issues Camden-Clark's CON exemption or it is otherwise issued as a matter of law in less than forty-five days if the parties' standstill agreement were abandoned.   While the parties disagree on the ability of an affected party to appeal an unfavorable decision, Defendants conceded in the hearing that HCA could not guarantee a stay on the exemption's issuance during the entire appeals process provided in § 16-2D-16.   Thus, the alleged burden to be suffered by Marietta is direct and imminent, and the benefits of a judicial decision outweigh the costs Marietta would suffer in undertaking an appeal under § 16-2D-16 that, according to the parties, may or may not be available.

7

enforcing a state law that violates Marietta's rights under the dormant commerce clause. (*See* ECF No. 9 at 6–9; ECF No. 1 at 17, ¶¶ 56–60.)

The commerce clause provides the United State Congress a vehicle with which to regulate aspects of interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3. Congress has the authority to regulate the channels and instrumentalities of interstate commerce as well as economic activities that have a substantial effect on interstate commerce. *See, e.g.*, *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 275–77 (1981); *Perez v. United States*, 402 U.S. 146, 150–52 (1971). The Tenth Amendment to the U.S. Constitution acts as a limit on Congressional powers by stating that all powers not granted to the United States, nor prohibited to the states, are reserved to the states or the people. *See* U.S. Const. amend. X; *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 767 (1945) ("[I]n the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.").

Despite this localized power, a state or local law may be held unconstitutional if it places undue burden on interstate commerce. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994) (hereinafter "Carbone"). Courts have long held that the commerce clause "limits the power of the States to erect barriers against interstate trade." *See, e.g.*, *Dennis v. Higgins*, 498 U.S. 439, 446 (1991) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980)). The doctrine analyzed below, the dormant commerce clause, has been inferred by the Supreme Court to represent the negative implications of the commerce clause. *See, e.g.*, *Wickard v. Filburn*, 317 U.S. 111, 123–24 (1942). *See also Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 782 (4th Cir. 1996).

If a state law burdens interstate commerce, it violates the dormant commerce clause unless it is necessary to achieve a legitimate government purpose.  *See Maine v. Taylor*, 477 U.S. 131, 138 (1986).  Otherwise, a state law "that discriminates against interstate commerce is the clearest example of the type of State law that imposes an unconstitutional burden" on commerce.  *Beskind v. Easley*, 325 F.3d 506, 514 (4th Cir. 2003).  A law discriminating against out-of-state actors is presumed invalid unless the state government shows a legitimate local purpose and demonstrates that the discrimination is necessary to achieve that goal—that the purpose cannot be achieved through any less discriminatory method.  *See Envtl. Tech. Council*, 98 F.3d at 785.  Favoring a state's own citizens is not a sufficient purpose, nor is advancing the state's economy while harming the economies of other states.  *See Yahama Motor Corp. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir. 2005) ("[W]hen a state statute . . . discriminates against interstate commerce, it will be struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992))).

The Supreme Court employs a "virtual per se rule of invalidity" when using the dormant commerce clause against attempts at local protectionism.  *See New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988) (describing economic protectionism as "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors").  *See also Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va.*, 787 F. Supp. 590, 597 (S.D. W.Va. 1991) (hereinafter "*Medigen*").  Two exceptions to the broad rule exist: (1) the law may be valid pursuant to Congressional approval, and (2) a state or local government, under the market participant exception, may prefer its own citizens in receiving benefits from government programs or in dealing with government-owned businesses.  *See S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467

U.S. 82, 87–88 (1984).   These two exceptions do not apply in this case.

In light of the difficulty in balancing a state's "right to impose even burdensome regulations in the interest of local health and safety" with an unlawful curtailment of commercial movement to advance its own economic interests, *see H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1940), the Supreme Court has guided courts to "eschew[ ] formalism for a sensitive, case-by-case analysis."   *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994).   Courts must look at the practical operation and effect of the state law in applying a flexible discrimination test.   *See Colon Health Ctrs. Of Am., LLC v. Hazel*, 813 F.3d 145, 152 (4th Cir. 2016).   "Courts are afforded some latitude to determine for themselves the practical impact of a state law, but in doing so they must not cripple the States' 'authority under their general police powers to regulate matters of legitimate local concern.'"   *Id.* (quoting *Maine*, 477 U.S. at 138 (internal quotation marks omitted)).

The validity of Virginia's CON program was recently litigated. After noting that the law was not facially discriminatory in that it did not explicitly treat in-state and out-of-state facilities differently, the Fourth Circuit examined whether the "certificate requirement erect[ed] a special barrier to market entry by non-domestic entities."   *Id.* at 153 (quoting *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 546 (4th Cir. 2013)).   Taking into account expert testimony, the court determined that the application process and end results did not show an "appreciable difference in the treatment of in-state and out-of-state entities."   *Id.*   In determining a potential dormant commerce clause violation, the Fourth Circuit advised other courts to focus on the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."   *Id.* at 154 (quoting *Granholm v. Heald*, 544 U.S. 460, 472 (U.S. 2005)).   In *Hazel*, there was no proven differential treatment, so the court declined to take "the potentially limitless step of

striking down every state regulatory program that has some alleged adverse effect on market competition." *Id.* at 155.

Another CON law enacted in Puerto Rico, similar in effect to the exemption statute at issue here, was found invalid under the dormant commerce clause by the First Circuit. *See Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005). The original statute at issue in *Rullan* required pharmacies opening or relocating within the commonwealth to obtain a "certificate of necessity and convenience," but a subsequent amendment exempted existing pharmacies from the certificate requirement. *See id.* at 52, 53. At the time of the amendment's enactment, "over ninety-two percent of pharmacies . . . were locally-owned concerns." *Id.* at 53. Other pharmacies that wished to enter the market went through a burdensome application procedure, where local entities had a right to oppose the granting of a certificate through a lengthy hearing process. *See id.* at 53–54. The statute allowed an existing pharmacy to object "simply because it fears additional competition." *Id.* at 56. While the law was not facially discriminatory, over fifty percent of out-of-commonwealth applicants were forced to endure the entire administrative process compared to less than twenty-five percent of local entities. *See id.* at 55, 56. Of those forced to undergo the hearing process, ninety percent of local entities were granted certificates compared to only fifty-eight percent of foreign applicants. *Id.* at 56. Thus, local existing pharmacies could constrict interstate commerce "for their own economic advantage." *Id.* at 57 (quoting *H.P. Hood & Sons, Inc.*, 336 U.S. at 533). Because the law worked to restrict market entry of out-of-commonwealth pharmacies, the First Circuit struck down Puerto Rico's law as invalid. *See id.* at 60.

A third and final case, which demonstrates this Court's willingness to strike down a state law as invalid under the dormant commerce clause, is *Medigen*, 787 F. Supp. at 590, *aff'd*, 985

F.2d 164 (4th Cir. 1993).   Interstate haulers of infectious medical waste brought suit against West Virginia's Public Service Commission to enjoin enforcement of a requirement that all transporters of such waste obtain a certificate of convenience and necessity to work within the state.   *See* 985 F.2d at 165.   The dormant commerce clause was implicated because market entry was only allowed by the Commission's determination that the market "[was] not adequately being served," which necessarily limited competition.   *See id.* at 166.   While the requirement was not facially discriminatory, this Court found the certification requirement unconstitutional, and the Fourth Circuit affirmed that decision, concluding "that the burden on interstate commerce imposed by requiring prospective market participants to make a showing of public convenience and necessity outweighs the local benefits identified."   *Id.* at 165.

In this case, Marietta argues that West Virginia Code § 16-2D-11(c)(12), is discriminatory on its face as well as in purpose and effect because it creates different legal standards for in-state and out-of-state hospitals.   (*See* ECF No. 9 at 7; ECF No. 1 at 10, ¶ 39.)   Unlike its in-state counterparts that do not have to demonstrate any need,[3] Marietta claims that out-of-state hospitals "must still meet the minimum need criteria for a CON to establish, construct, develop or acquire an ambulatory care center."   (ECF No. 9 at 8–9.)   Marietta states that this burdensome and differential treatment toward out-of-state hospitals renders the statute invalid under the dormant commerce clause and that the State of West Virginia cannot provide any "legitimate non-discriminatory reason that an in-state licensed hospital should be exempt" from the CON process. (*See* ECF No. 9 at 9; ECF No. 1 at 10, ¶ 39.)

---

[3] Defendants argued at the motion hearing that determining need was an inherent function of HCA even when reviewing a CON exemption application, but they conceded that the exemption statute, *see* W. Va. Code § 16-2D-11, does not provide any requirement that HCA must take need into consideration.

Defendants claim that § 16-2D-11(c)(12), is not discriminatory on its face or in purpose and effect because in-state hospitals "must provide virtually the same information that is required in a CON application through West Virginia licensure requirements and financial disclosure requirements . . . ." (*See* ECF No. 20 at 12.) "The exemption is simply saving in-state hospitals from having to produce this [financial] information twice; in essence, the exemption protects in-state hospitals against repetitions, that is all." (*Id.* at 23.) Indeed, the exemption application requires much less effort than fulfilling the requirements of a CON application. (*Compare* ECF No. 23-10 (Camden-Clark's 138-page CON application), *with* ECF No. 23-11 (Camden-Clark's 12-page CON exemption application).) Thus, according to Defendants, "§ 16-2D-11(c)(12), does not favor in-state economic interests over out-of-state interests and is not facially discriminatory." (ECF No. 20 at 15.) Defendants allege that, at most, the impact of the challenged provision on the commerce clause is "incidental." (*See id.* at 16.)

Interstate commerce seems to be burdened by the exemption statute at issue. Prior to the enactment of West Virginia Code § 16-2D-11(c)(12), any hospital that wanted to construct, develop, acquire, or otherwise establish an "ambulatory health care facility" in West Virginia needed to apply for a CON through HCA.[4]  *See* § 16-2D-8.  Since June 10, 2016, however, when subsection twelve was added to the code, a "licensed West Virginia hospital" that wants to establish such a facility "in the county in which it is located and in a contiguous county within or outside this state" became "exempt from the certificate of need process."  *See* § 16-2D-11(c)(12). This burdens interstate commerce by placing different standards on in-state and out-of-state

---

[4]  The 2010 legislative rule referred to earlier exempted in-state hospitals from seeking a CON for this purpose, but an in-state hospital was required to file a CON application if the proposed facility was opposed by any affected person. *See* W. Va. Code R. §§ 65-27-3, 65-27-4.

entities—in-state hospitals may apply for an exemption from a burdensome CON process that out-of-state hospitals must still endure.  Because the state statute's language explicitly allows an exemption for hospitals licensed in West Virginia while not affording the same exemption to out-of-state hospitals, it likely is discriminatory on its face.  *Cf. Carbone*, 511 U.S. at 390.  While Defendants argue that the exemption statute does not favor in-state economic interests over out-of-state interests, *see* ECF No. 20 at 16, the language of the statute reads otherwise.  *See* W. Va. Code § 16-2D-11(c)(12) ("[T]hese health services are exempt from the [CON] process: . . . (12) The construction, development, acquisition or other establishment *by a licensed West Virginia hospital* . . . ." (emphasis added)).  Furthermore, the statute allows any hospital the chance to object and request a hearing when out-of-state hospitals apply for a CON to acquire an ambulatory care facility, *see* W. Va. Code § 16-2D-13(g) ("An affected party has thirty days starting from the date the application is batched to request the authority [to] hold an administrative hearing."), but it does not afford the same opportunity when in-state entities apply for an exemption.  *See* W. Va. Code § 16-2D-11(b) ("The authority may not hold an administrative hearing to review the application.  An affected party may not file an objection to the request for an exemption.").

West Virginia Code § 16-2D-11 is remarkably different from the CON law held constitutional in *Hazel* in that the law there did not treat in-state and out-of-state entities "appreciabl[y]" differently.  *See* 813 F.3d at 153.  Defendants try to equate Virginia's and West Virginia's CON laws.  (*See* ECF No. 20 at 21.)  Here, however, the dissimilar treatment of hospitals based on state residency is apparent from the statute's plain language.  § 16-2D-11(c)(12) (providing the exemption only for "a licensed West Virginia hospital").  Unlike the statute at issue in *Houlton Citizens' Coalition v. Town of Houlton*, where "in-state and out-of-state

14

bidders [were] allowed to compete freely on a level playing field," *see* 175 F.3d 178, 188 (1st Cir.), the statute in this case puts in-state and out-of-state entities in different leagues.   It is similar to the challenged statute in *Rullan*, which gave "an on-going competitive advantage to the . . . local group of existing pharmacies."   405 F.3d at 52–54, 58.   The West Virginia law goes even further than that in *Rullan*, however, because out-of-state hospitals do not benefit at all from the West Virginia exemption whereas a few out-of-commonwealth pharmacies in that case still benefitted. *Id.* at 59.   The law there, which was seemingly less burdensome on out-of-commonwealth entities than the law in this case, was still held unconstitutional under the dormant commerce clause.   *See id.* at 60.

The presumption of invalidity may be rebutted if the State of West Virginia provides an important purpose and demonstrates that the discrimination is necessary to achieve that goal.   *See id.* at 59–60.   The West Virginia Legislature declares the following public policy within the state code's chapter containing the exemption:

> (1) That the offering or development of all health services shall be accomplished in a manner which is orderly, economical and consistent with the effective development of necessary and adequate means of providing for the health services of the people of this state and to avoid unnecessary duplication of health services, and to contain or reduce increases in the cost of delivering health services.

> (2) That the general welfare and protection of the lives, health and property of the people of this state require that the type, level and quality of care, the feasibility of providing such care and other criteria as provided for in this article, including certificate of need standards and criteria developed by the authority pursuant to provisions of this article, pertaining to health services within this state, be subject to review and evaluation before any health services are offered or developed in order that appropriate and needed health services are made available for persons in the area to be served.

*See* W. Va. Code § 16-2D-1.   The Court recognizes, as Defendants emphasize, that the public policy includes goals relating to the health and general welfare of in-state citizens.   As Marietta

pointed out at the motion hearing, however, the State has not conferred a benefit on itself or its citizens; rather, this involves a conferred benefit on private parties.   The legislative findings' focus on health and safety does not negate the fact that § 16-2D-11(c)(12), treats in-state and out-of-state hospitals appreciably differently.   *Cf. Hazel*, 813 F.3d at 153.   Economic efficiency, streamlined health services, and the general welfare and protection of citizens' lives, are aspirational goals for any state, but they are not purposes on which a facially discriminatory law may be justified.   As the Fourth Circuit noted in *Medigen*, "the goal of providing universal service at reasonable rates may well be a legitimate state purpose, but restricting market entry does not serve that purpose." 985 F.2d at 167.   While West Virginia may strive toward achieving its enumerated points of public policy, enacting a statute like § 16-2D-11(c)(12), which outwardly discriminates against out-of-state hospitals from competing equally with in-state entities, is probably unconstitutional under the dormant commerce clause.

For these reasons, Marietta is likely to succeed on its claim under the dormant commerce clause.

### B.   Likelihood of Irreparable Harm

To receive a preliminary injunction, Marietta must next demonstrate that it is "likely to suffer irreparable harm in the absence of preliminary relief."   *Winter*, 555 U.S. at 20.   Unlike a permanent injunction, which requires a *showing* of irreparable harm, a preliminary injunction requires only a *likelihood* of irreparable harm.   *See Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 Fed. App'x 351, 354 (4th Cir. 2011).   Furthermore, the likely threat of irreparable harm must be imminently present.   *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d

16

802, 816 (4th Cir. 1991) (recognizing that a threat of harm "at least a year down the road, maybe two or three years down the road" did not require a preliminary injunction).

Where a person's constitutional right will be denied if an action is allowed to continue, an irreparable harm will be established.  *See, e.g.*, *Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll. v. Wilson*, 92 F. Supp. 986, 988–89 (E.D. La. 1950), *aff'd*, 340 U.S. 909 (1951).   A preliminary injunction is not usually available "where the harm at issue can be remedied by money damages."  *See Bethesda Softworks, L.L.C.*, 452 Fed. App'x at 353 (citation omitted).   The Fourth Circuit has noted that the inquiry into the irreparable harm suffered from the denial of temporary relief "*must* necessarily *begin* with an analysis of the degree to which that particular relief remedies the alleged injuries."   *See Faulkner v. Jones*, 10 F.3d 226, 235–36 (4th Cir. 1993) (emphasis in original).   If the requested relief does not alleviate the alleged injuries, then refusal to grant that relief could not cause irreparable harm.  *See id.* at 236 ("Following the mistaken reasoning of the district court . . . if a party seeking to compel a state to provide her medication for cancer requested interim relief requiring the state to provide her with band-aids during the pendency of the litigation, the denial of that preliminary relief would ostensibly cause irreparable harm.").

Here, Marietta claims that its constitutional challenges to West Virginia Code § 16-2D-11(c)(12), demonstrate the irreparable harm it is likely to suffer.   (*See* ECF No. 9 at 11.)   Marietta further argues that its inability to participate in or object to the granting of CON exemptions immediately affects it.   (*See id.*)   Specifically, Marietta contends that it would be irreparably harmed by the granting of the exemption application of Camden-Clark.   (*See id.*)   Other legal

17

remedies like monetary damages, Marietta says, are "insufficient and inadequate to address or compensate for these irreparable injuries," (*id.* at 12).

The parties submitted contradictory claims on the issue of whether Marietta is likely to suffer irreparable harm if it does not receive injunctive relief.[5]   Marietta states in the parties' factual stipulation that it would call Greg Gibbs, a Certified Public Accountant who is "familiar with the requirements to obtain a CON or an exemption for an ambulatory health care facility in West Virginia and has participated in the CON application process on numerous occasions," to testify that, among other things, "the exemption process set forth in the new legislation does not allow for a hearing or for affected persons['] participation in the process" and that "out-of-state hospitals are penalized by the new provisions."   (*See* ECF No. 23 at 7.)   He would further testify that during the exemption application process, "there are no affected party objections, no public hearings, no consideration of need for the ambulatory care facility, and that the rights to appeal provided for by statute are limited."   (*Id.* at 8.)   Defendant Sonia Chambers, on the other hand, would testify on Defendants' behalf as HCA Member that "out-of-state hospitals are not harmed by the new provisions in the West Virginia Code . . . [and] that the CON program is a minimally intrusive way in which to glean a modicum of information about out of state facilities with which to protect the health and welfare of citizens of this state."   (*See id.* at 8–9.)   She would also testify that Marietta "would be able to file a notice of affected party status and obtain affected party status in the exemption process . . . [and] that if an exemption is granted, an affected party may appeal the decision to the Office of Judges."   (*Id.* at 9.)

---

[5] While the parties filed a joint stipulation of facts, (ECF No. 23), they did not provide declarations with the briefing or provide witnesses at the motion hearing.

At this preliminary stage and without concrete evidence providing otherwise, the Court finds that Marietta's claims regarding the likelihood of irreparable harm are more persuasive. As demonstrated above, Marietta is likely to succeed on its dormant commerce clause challenge to the statute. As established by *Wilson* and other cases, the denial of a constitutional right establishes an irreparable harm. *See, e.g.*, 92 F. Supp. at 989. Further, Marietta's irreparable harm is immediately present because HCA could otherwise grant Camden-Clark's exemption if not for this Court's agreed order issued September 23, 2016, requiring that "Defendants take no action on the pending application for an exemption and ambulatory care center filed by [Camden-Clark] . . . [or] on any other pending or to be filed applications for exemptions." (*See* ECF No. 14.) Even if HCA did not act on Camden-Clark's application, the exemption would be issued as a matter of law forty-five days from the application date. *See* W. Va. Code § 16-2D-11(b). This process severely restricts Marietta's right to fairly compete within the market of health care service providers. Thus, Marietta will inevitably and imminently suffer economic harm as a result of the statute at issue. Granting the requested equitable relief enjoining HCA from acting pursuant to West Virginia Code § 16-2D-11(c)(12), would relieve Marietta's alleged injuries.

For these reasons, the Court finds that Marietta has demonstrated that the granting of a CON exemption via West Virginia Code § 16-2D-11(c)(12), may deprive Marietta of a constitutional right. The Court therefore finds that Marietta has adequately demonstrated that it is likely to suffer irreparable harm in the absence of preliminary relief.

### C.   *Balance of Hardships*

Marietta must also demonstrate "that the balance of equities tips in [its] favor" to obtain a preliminary injunction. *Winter*, 555 U.S. at 20. The Court "must balance the competing claims

of injury and must consider the effect on each party of the granting or withholding of the requested relief."   *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

Marietta argues that by granting an injunction to prevent the issuance of exemptions under § 16-2D-11(c)(12), the Court "will protect the constitutional rights of all applicants and affected persons to due process, equal protection and protect interstate commerce."   (ECF No. 9 at 13.) Furthermore, Marietta claims that it could "lose the ability to enter the West Virginia market for ambulatory care centers at all, given that necessity of services and other criteria must be met by hospitals licensed out-of-state and . . . [that] West Virginia licensed hospitals could potentially saturate the market for ambulatory care centers in their county or contiguous counties before an out-of-state hospital's application could go through the CON review process."   (*See* ECF No. 9 at 12.)   Lastly, Marietta states that Defendants will not be harmed because until last year in-state hospitals were "required to follow the same procedures and process that out-of-state hospitals must by law follow . . . ."   (*See id.* at 13.)

The Court agrees with Marietta's position that the balance of hardships tips in its favor. Defendants do not provide any statement in their brief indicating that preliminary injunctive relief would cause HCA or the State any hardships.   As discussed at length above, Marietta has adequately demonstrated that its constitutional right is likely violated if the CON exemption process regarding ambulatory health care facilities is enforced.   By enjoining the State from enforcing § 16-2D-11(c)(12), the Court simply puts in-state and out-of-state hospitals back on a level playing field.   In-state hospitals such as Camden-Clark retain the ability to acquire an ambulatory health care facility by seeking a CON, which is the process that out-of-state hospitals must follow.

The Court certainly understands and appreciates the State's interests in "streamlin[ing] the [CON] process." (*See id.*)   Nonetheless, the State simply cannot place a protective veil over in-state hospitals and discriminate against out-of-state entities.   Marietta has a right at law to compete equally with in-state hospitals or at least be afforded the opportunity to present its case against the award of a CON exemption.   Here, Marietta's constitutional rights outweigh Defendants' efficiency concerns.   Accordingly, the Court finds that Marietta has demonstrated that the balance of hardships weighs in favor of preliminary injunctive relief.

D.   *The Public Interest*

Finally, Marietta must demonstrate that the "injunction is in the public interest" to obtain relief.   *Winter*, 555 U.S. at 20.   Courts should take into special consideration the public consequences in granting an injunction.   *See id.* at 24 (quoting *Weinberger v. Romero-Barcelo*, 465 U.S. 305, 312 (1982)).

The parties present conflicting public-interest considerations.   Marietta argues that the public interest is served when all hospitals, both in-state and out-of-state, comply with the same process within the CON regime.   (*See* ECF No. 9 at 13–14.)   More broadly, Marietta claims that there is a public interest in upholding constitutional principles and ensuring that civil rights are not violated.   (*See id.* at 14.)   Defendants argue that the public interest is served by requiring out-of-state, but not in-state, hospitals to file full CON applications when acquiring ambulatory health care facilities because in-state entities already provide this information through the licensing scheme and various state financial disclosure requirements.   (*See* ECF No. 20 at 32.)   Obtaining this additional information from out-of-state hospitals, Defendants claim, properly serves the health and safety of West Virginia residents.   (*See id.*)

"Certificate-of-need regimes—in place in many states across this country—are designed in the most general sense to prevent overinvestment in and maldistribution of health care facilities." *Hazel*, 813 F.3d at 153 (citing Lauretta H. Wolfson, *State Regulation of Health Facility Planning: The Economic Theory and Political Realities of Certificates of Need*, 4 DePaul J. Health Care L. 261, 262 (2001)). West Virginia's CON program seeks to improve health care quality, enable underserved and indigent populations access to care, and encourage cost-effective consumer spending. *See* § 16-2D-1. The Court cannot find that the public interest or these public policy goals are met by enforcing state laws that discriminate between in-state and out-of-state hospitals that provide care to the citizens of the State. The public has a strong interest in a fair and open process within which both in-state and out-of-state hospitals can equally participate. As the law currently stands, the process to which hospitals must submit when acquiring an ambulatory health care facility is not fair and open. Thus, Marietta has demonstrated that the injunction is in the public interest.

## IV. CONCLUSION

In summary, the Court finds that Marietta has demonstrated that it is likely to succeed on the merits of its dormant commerce clause claim, it is likely to suffer irreparable harm, the balance of hardships tips in its favor, and a preliminary injunction is in the public interest. The Court therefore finds that Marietta has satisfied each of the requirements for a preliminary injunction, *see Winter*, 555 U.S. at 20, and this extraordinary relief is warranted in this case.[6]

---

[6] As the Court finds that a preliminary injunction is warranted in this case, the final outstanding issue is the determination of the appropriate bond. Federal Rule of Civil Procedure 65(c) provides, in pertinent part, that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (citations omitted).

In the present matter, Marietta has not requested that the Court waive the Rule 65(c) bond requirement.

For the foregoing reasons, the Court **GRANTS** Marietta's motion for preliminary injunctive relief, (ECF No. 8), to the extent that Marietta requests a preliminary injunction enjoining HCA from enforcing the CON exemption relating to ambulatory health care facilities. Accordingly, the Court **PRELIMINARILY ENJOINS AND ORDERS** Defendants not to take action on the pending application for an exemption filed by Camden-Clark, CON File No. 16-5-10868-X, or any other applications for exemptions under West Virginia Code § 16-2D-11(c)(12). It is further **ORDERED** that the provisions of West Virginia Code § 16-2D-11(b), shall not apply by operation of law to allow for an automatic approval of any pending or to be filed applications for exemption under West Virginia Code § 16-2D-11(c)(12), due to the passage of forty-five days. Unless ordered otherwise, this Order shall remain in effect until such time as the Court reaches a final resolution in this matter.

     **IT IS SO ORDERED**.

     The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

               ENTER:      December 19, 2016

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

---

However, the parties previously agreed to a standstill order memorialized in this Court's agreed order issued on September 23, 2016.   (ECF No. 14.)   This preliminary injunction extends the effect of that order to which both parties agreed, so the Court does not find security necessary in this case to prevent unwarranted harm.

    Given these circumstances and the public interest in favor of a preliminary injunction, the Court finds that it is appropriate to waive the Rule 65(c) bond requirement for the present equitable relief.   Accordingly, the Court **ORDERS** that the Rule 65(c) bond requirement is **WAIVED** as to the preliminary injunction provided herein.